UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| DENNIS R., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-CV-938-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Dennis R. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 15).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 13. Plaintiff also filed a reply. *See* ECF No. 14. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 13tgyt) is **GRANTED.**

## BACKGROUND

On November 30, 2011, Plaintiff protectively filed an application for SSI, alleging disability beginning July 1, 2004 (the disability onset date), due to: loss of his left hand and injury to his stomach due to a gunshot wound; pain; post-traumatic stress disorder ("PTSD"); depression, anxiety, and associated psychological symptoms. Transcript ("Tr.") Tr. 897. The claim was denied initially on March 23, 2012, after which Plaintiff filed requested a hearing. Tr. 77-80. On April 25,

2013, Administrative Law Judge ("ALJ") Timothy McGuan held a hearing, at which Plaintiff appeared and testified. Tr. 42-68. The ALJ issued an unfavorable decision on May 30, 2013. Tr. 22-41. The Appeals Council denied review (Tr. 4-8), and Plaintiff appealed to this Court. On April 17, 2017, Court remanded the case for further administrative proceedings (Tr. 749-52).

On March 5, 2019, ALJ McGuan ("the ALJ") held another hearing, at which Plaintiff appeared and testified and was represented by Kelly Laga, an attorney. Tr. 608-40. Christine Ditrinco, an impartial vocational expert ("VE"), also appeared and testified at the hearing. On March 14, 2019, the ALJ issued a second unfavorable decision. Tr. 581-607. Plaintiff appealed that decision directly to this Court. The ALJ's March 14, 2019 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71

2

(1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his March 14, 2019 decision:

1. The claimant has not engaged in substantial gainful activity since November 30, 2011, the application date (20 CFR 416.971 *et seq.*);

2. The claimant has the following severe impairments: traumatic left hand amputation with hypersensitivity at the median and ulnar nerve stump and left shoulder impingement, phantom limb syndrome, degenerative disc disease of the cervical spine, depressive disorder, and post-traumatic stress disorder (PTSD) (20 CFR 416.920(c));

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);

4. The claimant has the residual functional capacity to perform of light work.[1] as defined in 20 CFR 416.967(b) except the claimant can sit up to 8 hours in an 8-hour workday, and stand up and walk up to 8 hours in an 8-hour workday. The claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. The claimant can never use the left (non-dominant) hand for fingering or grasping, and no limits with the use of the right hand and arm. The claimant must avoid concentrated exposure to extreme cold. The claimant can have frequent interaction with others. The claimant can perform semi-skilled work;

5. The claimant has no past relevant work (20 CFR 416.965);

6. The claimant was born on September 23, 1972 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963);

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964);

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968);

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a);

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 30, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. 581-607.

Accordingly, the ALJ determined that, based on the application for supplemental security benefits filed on November 30, 2011, the claimant is not disabled under section 1614(a)(3)(A) of the Act. Tr. 599.

## <u>ANALYSIS</u>

Plaintiff essentially asserts a single point of error—that the ALJ erred in determining his RFC. *See* ECF No. 9-1 at 16-22. Specifically, Plaintiff asserts that the physical RFC is unsupported by substantial evidence because the ALJ's physical RFC conflicted substantially with those opinions. *See id*. at 16. Plaintiff also asserts that the mental RFC is similarly unsupported by substantial evidence because the ALJ did not discuss the specific limitations in some of the medical opinions and failed to incorporate them into the RFC, or to explain why they were not incorporated. *See id*. at 20.

The Commissioner responds that the ALJ properly considered all of the evidence, including Plaintiff's testimony, the medical findings in the record, and the medical opinion evidence to determine Plaintiff could perform a limited range of light work. *See* ECF No. 13-1 at 17. Accordingly, argues the Commissioner, the ALJ's RFC finding is supported by substantial evidence.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The

Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon careful review of the record in this case, the Court finds that the ALJ conducted a careful review of the evidence in formulating the RFC and set forth a well-supported RFC finding. The ALJ granted appropriate weight to the opined limitations that were supported by the record, and the RFC assessed by the ALJ was supported by substantial evidence. Tr. 584.

On August 26, 2011, Plaintiff was admitted to Erie County Medical Center ("ECMC") with a gunshot wound to his abdomen and left hand. Tr. 315. He underwent a full amputation of his left hand, as well surgery to treat his abdominal gunshot wound. Tr. 316. He spent several weeks in the hospital recovering from his multiple injuries and was discharged on September 16, 2011. Tr. 315-17.

On October 18, 2011, Plaintiff saw Mark Orlowski, PA ("Mr. Orlowski"), for left wrist and phantom hand pain. Tr. 369. Plaintiff was taking oxycodone two to three times a day without relief. Tr. 369. He had tenderness and swelling of his wrist (Tr. 370); however, x-rays showed no evidence of osteomyelitis (Tr. 371). Plaintiff was prescribed pain medication, but he refused therapy for desensitization of his stump. Tr. 371.

At a November 17, 2011 appointment with John J. Callahan, M.D. ("Dr. Callahan"), Plaintiff stated that his pain had improved a little but still kept him up at a night. Tr. 366. Examination of his left wrist amputation site showed less swelling, but Plaintiff had paresthesia (abnormal sensation) over the median nerve. Tr. 367. Dr. Callahan advised Plaintiff that if he continued to experience pain, he could consider further surgery. Tr. 368. He indicated Plaintiff was 100 percent disabled and that a full recovery was not expected. *Id*.

At a November 30, 2011 pain management visit with Pratibha Bansal, M.D. ("Dr. Bansal"), Plaintiff was informed about an injection procedure to address residual pain after his hand

amputation. Tr. 313. Dr. Bansal suggested methadone to decrease neuropathic pain, but Plaintiff refused. *Id*.

Joan Osswald, M.D. ("Dr. Osswald"), with Mercy Comprehensive Care Center, completed an assessment form from the New York State Office of Temporary Disability Assistance on December 15, 2011. Tr. 1129. Dr. Osswald indicated that Plaintiff had a permanent left-hand injury resulting in amputation, a fair prognosis, and was taking pain medication. *Id*. She also indicated that Plaintiff had very limited ability to lift, carry, push, pull, bend, and use his hands and opined that Plaintiff was disabled and unable to work. Tr. 1130.

Dr. Osswald completed another form on December 19, 2011 indicating that Plaintiff could work no hours per day, could stand for 60 minutes at a time and for 4 hours total, and sit for 4 hours at a time and total over the course of an 8-hour workday. Tr. 1127. She indicated that Plaintiff could occasionally bend, stoop, balance, and tolerate heat and cold and never perform fine or gross manipulation with his left hand; never raise his left arm over his shoulder, and never work around dangerous machinery or operate a car. Tr. 1127. Dr. Osswald observed that Plaintiff "should qualify for SSD" due to his left-hand amputation. *Id*.

During a December 29, 2011 appointment with Dr. Callahan, Plaintiff complained of worsening pain since stopping oxycodone. Tr. 363. He reported he had gone to pain management with Dr. Bansal, but she wanted him to come twice weekly, which he could not do because he did not have transportation. *Id*. Upon examination, Plaintiff had hypersensitivity at his left wrist. Tr. 364. Dr. Callahan recommended pain management and a trial of ganglion blocks for pain control. Tr. 365. He opined that Plaintiff was 100 percent disabled, and a full recovery was not expected. *Id*.

At his next visit with Dr. Callahan on February 16, 2012, Plaintiff said his symptoms were unchanged and none of the pain management specialists in the area would take his insurance. Tr.

406. He indicated medication was improving his pain, but he also complained of worsening shoulder pain. Dr. Callahan noted new onset of left shoulder impingement and provided Plaintiff with information about possible revision of his amputation to decrease his pain. Tr. 409. Dr. Callahan administered a shoulder injection and advised Plaintiff to return in 4-6 weeks. *Id.*

On February 28, 2012, Plaintiff began counseling with Maura Banar, M.S. ("Ms. Banar"), with Spectrum Human Services ("Spectrum"). Tr. 427-28. Plaintiff stated he was "feeling significantly depressed" since his gunshot injury and was worried about an upcoming court date for an unrelated burglary charge. Tr. 427, 428. He also reported he was having difficulty sleeping. Plaintiff said he "worked in construction for many years, off the books." Tr. 427. On March 13, 2012, Ms. Banar sent Plaintiff a letter because he had missed his last appointment. *Id.* Plaintiff saw Ms. Banar again on April 9, 2012 (Tr. 429-32), but then missed his appointment on May 17, 2012 (Tr. 432).

On March 8, 2012, Plaintiff underwent a consultative physical examination with Donna Miller, D.O. ("Dr. Miller"). Tr. 373-76. He complained of left-hand phantom pain and abdominal pain.  He stated that "in general" his pain was 6 out of 10; moving his left upper extremity increased the pain; and medication helped alleviate the pain. Tr. 373. Plaintiff also reported he developed a ventral hernia since the event, resulting in abdominal pain that was a 5 or 6 out of 10 in intensity. *Id.* Plaintiff said he was not a candidate for a prosthesis because of the severe pain, but he indicated he might be able to get a prosthesis in the future. *Id.* Upon examination, Plaintiff appeared to be in no acute distress and walked with a normal gait. Tr. 374. He could walk on heels and toes without difficulty, and he used no assistive devices; needed no help changing for the exam or getting on and off the exam table; and he could rise from a chair without difficulty. *Id.* Musculoskeletal examination was largely normal apart from the amputation of his left hand. Tr. 375. Dr. Miller opined that Plaintiff had severe limitation with the use of his left upper extremity with regards to

lifting, carrying, pushing, pulling, and fine finger dexterity, and moderate limitation with repetitive bending and heavy lifting because of his ventral hernia. Tr. 376.

The same day, Plaintiff had a consultative psychological evaluation with Susan Santarpia, Ph.D. ("Dr. Santarpia"). Tr. 377-80. Dr. Santarpia noted that Plaintiff's appearance, speech, thought processes, and affect were normal. Tr. 378. His mood was neutral; his sensorium was clear; and he was fully oriented. Tr. 379. His attention, concentration, and memory were all intact; his cognitive functioning was estimated to be low average; and his insight and judgment were fair. *Id.* Dr. Santarpia opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and learn new tasks within normal limits. *Id.* She further opined that Plaintiff had "mild" impairment of his ability to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress due to fatigue. *Id.* She indicated that while the results of the evaluation appear to be consistent with psychiatric problems, Plaintiff's symptoms did not "appear to be significant enough to interfere with his ability to function on a daily basis." Tr. 380.

On April 9, 2012, Plaintiff saw psychiatrist Ann Marie Pasek, M.D. ("Dr. Pasek"), at Spectrum, for an initial psychiatric assessment. Tr. 430. Plaintiff reported a long history of depression and anxiety exacerbated by the loss of his hand. *Id.* He described symptoms of depression, low energy and low motivation, as well as PTSD symptoms. *Id.* Mental status examination revealed some mild psychomotor agitation and pressured speech, and his affect was depressed, anxious, and irritable. Tr. 431. Plaintiff denied suicidal or homicidal ideation or auditory or visual hallucinations. *Id.* He was alert and fully oriented and his recent and remote memory were intact. *Id.* His intelligence was average, and his insight and judgment were fair to good. *Id.* Dr. Pasek diagnosed PTSD and depression and prescribed antidepressant medication. *Id.*

Plaintiff saw Dr. Callahan on May 31, 2012 and reported no change in his symptoms. Tr. 410. Dr. Callahan recommended left revision amputation to possibly reduce pain, and Plaintiff agreed. Tr. 412.

Plaintiff had additional counseling sessions with Ms. Banar and Gerald Frisicaro, NP, in June 2012, August 2012, October 2012, November 2012, December 2012, January 2013, February 2013, and April 2013. Tr. 436, 438-39, 493-94, 498, 507, 509, 511, 523, 544. Over the course of treatment, Plaintiff also missed a number of appointments. Tr. 429, 432-33, 437, 447, 496-97, 451, 494, 509-10, 525, 528, 536, 543, 546, 548-49.

Plaintiff underwent surgery on July 10, 2012, for revision of his amputation site. Tr. 413, 68-90. At his next visit on July 24, 2012, Plaintiff said his symptoms had worsened. Tr. 416. Dr. Callahan again suggested pain management if symptoms did not improve. Tr. 418. Orders were written for an occupational therapy evaluation and treatment two to three times a week for four weeks. Tr. 418. On September 20, 2012, Plaintiff returned to Dr. Callahan and indicated his pain was unchanged, and his current pain level was 8 out of 10. Tr. 422. He reported that the prescribed medication had helped his symptoms. *Id*. Plaintiff still had not seen a pain management specialist. Tr. 424.

On October 30, 2012, Plaintiff told Mr. Orlowski his arm felt the same, but his pain was controlled with narcotic medication. Tr. 485. He rated his pain as 2 out of 10 with medication. Tr. 485.

On January 21, 2013, Plaintiff presented to Shahid Banday, M.D. (Dr. Banday"), "demanding refill for pain medication." Tr. 1147-48. Once told that he should seek alternative treatment for his current narcotic medication, Plaintiff "declined and left the room abusing." Tr. 1148.

Plaintiff saw Dr. Callahan on January 23, 2013 and complained of continued pain exacerbated by the cold weather. Tr. 487. Dr. Callahan advised Plaintiff that he was ready to be fitted with a prosthetic device for his left arm and also told Plaintiff he needed to start weaning off of pain medication. Tr. 488.

Plaintiff reported trouble sleeping at a February 12, 2013 appointment with Jerry Frisicaro, NP ("Mr. Frisicaro"), at Spectrum Health Services ("Spectrum". Tr. 509). Plaintiff's mood was fair, and his affect was more engaged and motivated. *Id*. His antidepressant dosage was increased. *Id*.

Plaintiff returned to Mr. Orlowski on March 26, 2013, for left forearm pain. Tr. 1007. Examination only revealed tenderness of the left wrist at the distal fat pad. Tr. 1008. Plaintiff was instructed to wean off his pain medication and see pain management if he could not. *Id*.

From April 16, 2013, to May 21, 2014, Plaintiff saw Gautam Arora, M.D. ("Dr. Arora"), and Lonnie Kloc, NP ("Mr. Kloc"), at Hens Pain Center, for left arm pain management and medication refills. Tr. 560-74, 1021-45. Plaintiff reported that medication provided 30 to 40 percent relief of his pain for 3 to 4 hours. Tr. 560.

On August 1, 2013, Mr. Frisicaro completed a Medical Source Statement indicating that Plaintiff had ongoing severe tenseness; trauma symptoms including hyperarousal, hypervigilance, and avoidance; depressed mood; and cognitive limitations, Tr. 576. He indicated Plaintiff had extreme difficulties in maintaining social functioning; extreme deficiencies in concentration, persistence, or pace; marked restriction of daily activities; and three episodes of decompensation within a 12-month period. Tr. 578. He indicated Plaintiff would be absent from work more than four days per month. Tr. 579.

On August 22, 2013, Plaintiff returned to Dr. Banday for psoriasis and "form completion." Tr. 1142. As noted above, Plaintiff's prior visit had been abandoned after he demanded pain

11

medication and was advised to seek alternative treatment. *Id.* It appears that on that same day, Dr. Banday completed a form indicating that Plaintiff had a permanent left hand impairment, long-term depression, and had "very limited" ability to lift, carry, push, pull, bend, or use his hands. Tr. 1157-58. The signature on the form is unclear, and although Plaintiff indicates that the form was filled out by Dr. Bansal (*see* ECF No. 1 at 13), the form was completed the same day Plaintiff asked Dr. Banday to fill out forms. Tr. 1142.

Plaintiff saw Mr. Kloc on June 21, 2014, for medication refills. Tr. 1014. A toxicology screen was positive for cocaine, alcohol, and morphine. Tr. 1016. Plaintiff was told that the use of any illicit drugs or alcohol while receiving prescription pain medication was prohibited and would result in discontinuation of treatment. Tr. 1019.

On July 8, 2014, Plaintiff went to the emergency room complaining of right shoulder pain for two months. Tr. 1191. X-ray examination showed minor degenerative changes in the right shoulder. Tr. 1196. Plaintiff was discharged home with medication and instructed to see a primary care provider. Tr. 1197.

On February 19, 2015, Plaintiff saw Haitham Hassane, M.D. ("Dr. Hassane"), for a physical. Tr. 1181. Examination was positive for a hernia and psoriasis on Plaintiff's left ankle. Tr. 1182. He was referred to a pain management specialist. Tr. 1183.

On April 15, 2015, Plaintiff had a consultative psychological examination performed by Kristina Luna, Psy.D. ("Dr. Luna"). Tr. 1170. Plaintiff's attention was intact, but his recent and remote memory were mildly impaired. Tr. 1172. Dr. Luna opined that Plaintiff had no limitation of his ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and make appropriate decisions. *Id.* She indicated that Plaintiff was mildly limited in his ability to perform complex tasks independently, relate adequately with others, and appropriately deal with

stress. Tr. 1173. Dr. Luna further indicated that Plaintiff's difficulties were caused by distractibility, and she recommended psychotherapy and vocational training.  Tr. 1173. She opined that his prognosis was good. *Id*.

On December 5, 2016, Plaintiff was brought to the emergency room by EMS because he was found unresponsive by a bystander. Tr. 1198. Upon arrival, Plaintiff was arousable by verbal stimuli and admitted to using heroin and alcohol that day. *Id*. He reported shooting up more heroin than usual because he had just been discharged from jail. Tr. 1199. Plaintiff was assessed with opiate poisoning and discharged home the same day. Tr. 1200, 1203. Upon discharge, he was awake, and alert and oriented to person, place, and time, with no cognitive and/or functional deficits. Tr. 1203.

Two weeks later, Plaintiff saw Nathalie Bousader-Armstrong, M.D. ("Dr. Bousader-Armstrong"), at Mercy Comprehensive Care Center, to have disability forms completed. Tr. 1178. Plaintiff reported no particular complaints and said he was not currently receiving care anywhere else. *Id*. Plaintiff's examination results were unremarkable, except Dr. Bousader-Armstrong noted his large abdominal hernia. Tr. 1179.

From January 23, 2017, to March 22, 2017, Plaintiff received outpatient treatment at Erie County Medical Center ("ECMC") for heroin addiction. Tr. 664-84. On April 4, 2017, Plaintiff began inpatient treatment at ECMC for alcohol, opiate, and cocaine dependence. Tr. 659-63. Prior to admission, Plaintiff reported using heroin daily for five years. Tr. 659. His last dose of heroin was "3 bags by IV" two days prior to his admission. *Id*. Plaintiff also reported using cocaine and Klonopin. *Id*. On April 12, 2017, Plaintiff was "administratively discharged due to smoking on the unit." Tr. 658. Plaintiff was noted to be "medically stable" at the time of discharge, and he "flatly denie[d] any suicidal or homicidal ideation." *Id*.

On July 4, 2017, Plaintiff was brought to the emergency room after he was found sleeping in the street. Tr. 1217. Plaintiff admitted he had been drinking heavily and using heroin. Tr. 1221. He was discharged "home ambulatory" five hours later. Tr. 1219. He was alert and oriented to person, place, and time, and no cognitive and/or functional deficits were noted. *Id*.

Plaintiff returned to the emergency room on August 13, 2017, complaining of shoulder pain after falling off of a bike. Tr. 1230. He had decreased right shoulder range of motion with pain and tenderness. Tr. 1234. X-rays showed "some AC joint arthropathy" but no fracture or acute injury. Tr. 1239. Plaintiff was instructed to see a primary care provider and discharged. Tr. 1235.

Plaintiff went to the emergency room on September 16, 2017, for suicidal ideation. Tr. 651, 655. He had used heroin several days earlier and had been using cocaine and drinking on the day he presented. Tr. 651. Plaintiff reported he had been staying with a friend, but he could only stay for a couple of more weeks and needed to find a place to stay. Tr. 652. Once Plaintiff regained sobriety, he denied suicidal ideation, but he complained of poor sleep and a dysphoric mood. *Id*. Mental status examination was normal except for "blunted" affect and fair insight and judgment. *Id*. Plaintiff stated he was interested in returning to outpatient treatment at Spectrum. *Id*. He was diagnosed with substance abuse and PTSD by history. Tr. 654.

Plaintiff was taken to the emergency room by EMS again on December 3, 2017. Tr. 1289. EMS reported that Plaintiff had overdosed on heroin. *Id*. Plaintiff became alert and oriented after he was given 0.5mg of Narcan. *Id*. He was never evaluated by a physician because he left the hospital without notice, apparently with his IV still in place. Tr. 1290.

On January 25, 2018, Samuel Balderman, M.D. ("Dr. Balderman"), performed a consultative physical examination. Tr. 1247-49. Examination was benign apart from Plaintiff's left- hand amputation. Tr. 1248. Dr. Balderman opined that Plaintiff had marked limitation in the use of his left arm for fine or gross motor work. Tr. 1249. He completed a Medical Source

Statement form indicating that Plaintiff could continuously lift and carry up to 20 pounds but that he was missing his left hand. Tr. 1250. Plaintiff could sit, stand, and walk for four hours at a time, and sit and walk for six hours and sit for four hours over the course of a workday. Tr. 1251. He had no limitation of his right hand or feet, but he could not perform any activity with his left hand. Tr. 1252. He could frequently perform all postural activity except he could never crawl. Tr. 1253. Plaintiff could perform most activities listed on the form except for sorting, handling, or using paper files. Tr. 1255.

Plaintiff returned to the emergency room on November 29, 2018 for abdominal pain. Tr. 1293. It was noted that Plaintiff smelled of alcohol. *Id*. He was in no acute distress and appeared comfortable. Tr. 1294. His behavior was agitated but cooperative. *Id*. Plaintiff declined to provide a urine sample because he said he had used cocaine several days earlier. Tr. 1294. He complained of a year-long history of hernia pain, but he stated could not stay clean enough to do anything about it. Tr. 1294. A CT scan of his abdomen showed herniation of the large and small bowel, shrapnel consistent with his gunshot history, and surgical repair of the right abdomen. Tr. 1307. Lab testing was essentially normal, and Plaintiff was instructed to follow up with surgery the following day about a hernia repair procedure. Tr. 1298.

On December 26, 2018, Plaintiff presented to Brittany Derry, LMHC ("Ms. Derry"), for treatment for anxiety, depression, and potential PTSD. Tr. 1257. He initially denied any substance use history apart from having "dabbled" with cocaine and marijuana 25 years earlier. *Id*. He also reported that he had two cups of wine on Christmas day. *Id*. Plaintiff later acknowledged that he used cocaine several times a year over the last four to five years. Tr. 1277. Plaintiff also admitted he had abused benzodiazepines in the past with his last use at least a year earlier. Tr. 1279. Plaintiff did not return for any follow-up appointments after his initial assessment. Tr. 1283.

On January 17, 2019, Plaintiff had a pre-operative clearance examination with Megan Johnson, M.D. ("Dr. Johnson"), at Mercy Comprehensive Care Center. Tr. 1311-13. Plaintiff was advised to "stop smoking ASAP prior to his surgery" and to return for follow up six weeks after surgery. Plaintiff underwent hernia repair surgery on January 22, 2019. Tr. 643, 645-46. He was discharged five days later. Tr. 643. By February 7, 2019, Plaintiff was improving, eating well, and his incision was healing normally. Tr. 1314.

As noted above, Plaintiff asserts that the ALJ erred in determining his RFC. *See* ECF No. 9-1 at 16-20. Specifically, Plaintiff complains that the physical RFC was not supported by substantial evidence because the ALJ's RFC conflicted substantially with opinions to which the ALJ gave "great" or "significant" weight. *Id*. at 16.

A claimant's RFC is the most he can still do despite his limitations and is assessed based on an evaluation of all the relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence

available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Here, the ALJ properly considered all the evidence, including Plaintiff's testimony, the medical findings in the record, and the medical opinion evidence, to determine that Plaintiff could perform a limited range of light work. First, the ALJ considered Plaintiff's testimony. In doing so, the ALJ identified a number of inconsistencies between Plaintiff's testimony and reported limitations and the evidence in the record as a whole. An ALJ may properly consider inconsistencies between a claimant's testimony and the record about the nature and extent of substance abuse. *See, e.g., Wozniak v. Comm'r of Soc. Sec.*, No. 1:14-CV-00198-GWC, 2015 WL 4038568, at *8 (W.D.N.Y. June 30, 2015); *Miles v. Astrue*, No. 07-CV-691S, 2009 WL 2957958, at *5 (W.D.N.Y. Sept. 11, 2009).

The ALJ noted Plaintiff's March 5, 2019 testimony that he no longer engaged in substance abuse; however, he was treated in 2018 for alcohol intoxication and poly-substance abuse.   Tr. 593. Additionally, during Plaintiff's testimony, he minimized his substance abuse problems, testifying it had been "over a year" since he used anything other than alcohol. Tr. 631. However, the record shows that roughly three months earlier, Plaintiff declined to provide a urine sample at the emergency room because he said he had done cocaine several days earlier. Tr. 1294. Plaintiff similarly provided misleading statements to other providers regarding his substance use. In December 2018, Plaintiff told Ms. Derry he had not engaged in cocaine or heroin use for many

years (Tr. 1257), but he later admitted using cocaine and benzodiazepines several times a year over the last four to five years (Tr. 1277). Furthermore, the record shows multiple hospitalizations for heroin use during the relevant period. Tr. 651, 1198, 1217, 1289.

The ALJ also noted evidence of drug seeking behavior. Tr. 593. Plaintiff presented to Dr. Banday in 2013 demanding narcotic pain medications and left when it was refused. Tr. 1148. "Plaintiff's drug seeking behavior serves to generally discount [his] testimony as it relates to the severity of [his] symptoms." *Weakland v. Astrue*, No. 10-CV-519S, 2012 WL 1029671, at *5 (W.D.N.Y. Mar. 26, 2012) Plaintiff also told Mr. Kloc he had not engaged in any drug or alcohol use in 2014, but a drug screen at that time was positive for cocaine, morphine, and alcohol. Tr. 1015, 1016.

The ALJ also reviewed the medical findings, which showed very few functional limitations outside of Plaintiff's left-hand amputation. Tr. 594. At consultative examinations with Dr. Miller and Dr. Balderman, Plaintiff appeared to be in no acute distress and walked with a normal gait. Tr. 374, 1248. He could walk on heels and toes without difficulty; he used no assistive devices, needed no help changing for exam or getting on and off exam table, and could rise from a chair without difficulty; and he had full motor strength and normal sensation in all extremities and no swelling, tenderness, or instability in any of his joints. Tr. 374-75, 1248. Dr. Bansal similarly indicated that Plaintiff had a normal gait and stance. Tr. 313. In March and April 2017, Plaintiff's physical examination was normal, apart from his left-hand amputation and his reducible hernia. Tr. 661-62, 665.

The ALJ also noted that Plaintiff's psychiatric findings were inconsistent with disabling limitations. Tr. 594. In 2012, Plaintiff's appearance, speech, thought processes, and affect were normal; his mood was neutral, his sensorium was clear, and he was fully oriented; and his attention, concentration, and memory were all intact. Tr. 378-79. Examination in 2017 revealed more

symptoms including a flat affect and apathetic mood, but Plaintiff was not receiving any type of mental health treatment at the time. Tr. 1170, 1172. Plaintiff's attention and concentration were intact, and his memory was impaired by anxiety or nervousness in the evaluation. Tr. 1172. In March 2017, other mental status examinations revealed limited insight, but were otherwise intact. Tr. 665-66, 669-70, 673-74. The ALJ properly considered the medical findings when weighing Plaintiff's subjective reports. *See* 20 C.F.R. § 416.929.

The ALJ also discussed evidence of Plaintiff's noncompliance with treatment. Tr. 593. As discussed above, Plaintiff took street drugs and consumed alcohol while he was in pain management. Tr. 1015-16. Plaintiff was given a prosthetic for his left arm, but he declined to use it and could offer little explanation when asked why by the ALJ at the hearing. Tr. 488, 620. Plaintiff was discharged from drug rehabilitation for rules violations. Tr. 657. He also had attendance problems in both substance abuse counseling and mental health counseling. Tr. 429, 432-33, 437, 447, 496-97, 451, 494, 509-10, 525, 528, 534, 536, 543, 546, 548-49, 593, 1035, 1181. An ALJ may reasonably consider a pattern of noncompliance. *See, e.g., Wilson v. Colvin*, No. 6:16-CV-06509-MAT, 2017 WL 2821560, at *6 (W.D.N.Y. June 30, 2017); *Nicholson v. Colvin*, No. 6:13-CV-1296 FJS/TWD, 2015 WL 1643272, at *7 (N.D.N.Y. Apr. 13, 2015).

The ALJ also did not err in observing that Plaintiff received virtually no mental health treatment for a number of years, despite his complaints of severe mental health symptoms. Tr. 592. "Where, as here, a claimant has sought little-to-no treatment for an allegedly disabling condition, his inaction may appropriately be construed as evidence that the condition did not pose serious limitations." *Diaz-Sanchez v. Berryhill*, 295 F. Supp. 3d 302, 306 (W.D.N.Y. 2018). There was approximately a five-year gap between Plaintiff's last appointment with Ms. Banar in 2013, and his appointment with Ms. Derry on December 2018. Tr. 1257. As noted above, Plaintiff attended no further appointments with Ms. Derry after his initial appointment. Tr. 1283. Plaintiff testified

that he stopped going to mental health treatment but stated he" really [did not] have an excuse." Tr. 614. At the hearing, Plaintiff indicated he was not taking any medication for mental health symptoms. Tr. 616.

The ALJ also observed that, when asked why he had little to no reported earnings, Plaintiff indicated that he had worked "off the books" and had last done so "a few years" earlier. Tr. 51, 137, 593. As the ALJ discussed, work off the books, potentially during the same period he alleged disability, is inconsistent with claims of disability. Tr. 593. *See, e.g., Shealy v. Saul*, No. 18-CV-1193F, 2020 WL 1283442, at *6 (W.D.N.Y. Mar. 18, 2020); *Brantell v. Astrue*, No. 08-CV-884S, 2010 WL 1038683, at *6 (W.D.N.Y. Mar. 19, 2010).

For all of these reasons, the ALJ reasonably determined that Plaintiff's subjective complaints were inconsistent with the record as whole. Tr. 592-94. Based on Plaintiff's lack of mental treatment noted above, his claim for disability rested largely on his subjective complaints of pain and mental health symptoms. Notably, Plaintiff does not dispute the ALJ's analysis of his subjective reports. Because the ALJ found Plaintiff's complaints inconsistent with the record as a whole, he was not required to incorporate all of those alleged limitations in the RFC. *See Barry v. Colvin*, 606 F. App'x 621, 622–23 (2d Cir. 2015) (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (ALJ may exercise discretion in weighing claimant testimony in light of other evidence in the record).

Plaintiff also argues that the ALJ erred in formulating Plaintiff's RFC because he did not include any limitations of his left arm apart from an inability to finger or grasp with the left hand. *See* ECF No. 13-1 at 16-20. Plaintiff argues that the ALJ's RFC was flawed because the RFC "conflicted" with limitations contained in medical opinions to which the ALJ afforded significant weight, including limitations in lifting, carrying, pushing, pulling, bending, and using his hands; using his left hand for fine or gross manipulation; or raising his left arm above shoulder level. *See*

20

*id*. However, Plaintiff's argument ignores the fact that the ALJ's RFC completely precluded Plaintiff from performing either fingering (fine) or grasping (gross) manipulation, and therefore, already considers the limitations about which Plaintiff complains. Tr. 591.

The ALJ acknowledged that Plaintiff's left-hand amputation left him unable to perform fine or gross manipulation with his left arm. Tr. 591. "A limitation in the ability to grip, grasp, or twist is a limitation in 'handling,' which the Commissioner defines as the ability to 'seiz[e], hold [ ], grasp[ ], turn[ ], or otherwise work[ ] primarily with the whole hand or hands . . . .'" *Madrid v. Astrue*, No. EDCV 10-1288 AJW, 2011 WL 2444909, at *3 (C.D. Cal. June 17, 2011) (quoting SSR 85-15). Although the ALJ did not explicitly state that Plaintiff could not reach overhead with his left arm, Plaintiff's inability to grasp an object reasonably translated to an inability to lift, carry, push, or pull an object, and given these limitations, there would be no reason for Plaintiff to reach overhead with his left arm. Accordingly, the functions Plaintiff argues should have been precluded by the RFC already fall within the activities the ALJ found Plaintiff could not perform.

In addition, the ALJ's hypothetical question to the VE specifically included the following non-exertional limitations: "there would be no use of a left, non-dominant hand for fingering and grasping, but there would be no limits with the use of a dominant hand in any sense." Tr. 633.  In response, the VE testified that her testimony departed from the Dictionary of Occupational Titles ("DOT") in that the DOT required the use of both upper extremities. Tr. 635. Thus, the record reflects that the VE clearly understood the hypothetical to preclude any activity with the left arm. Additionally, in response to questioning from Plaintiff's representative, the VE went on to testify that the jobs she identified did not involve working with both hands based on her experience and analysis of the jobs. Tr. 635. She also testified that, in the jobs she identified, "the worker is not working with their hands or arms lifting things to perform the essential job tasks." Tr. 636. Thus, even had the ALJ included the specific limitations cited by Plaintiff, it would not have changed

the ALJ's decision. Thus, the failure to incorporate those limitations was, at most, harmless error. *See, e.g., Ortiz v. Colvin*, 298 F. Supp. 3d 581, 590 (W.D.N.Y. 2018) ("Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration.") (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

SSR 83-12 provides that an amputation below the elbow requires an evaluation of functional ability and the "person's remaining ability for fine and gross manipulating." *See id*. Here, the ALJ found Plaintiff could not finger or grasp, which equates to no ability to perform fine or gross manipulation with the left arm. Thus, as the VE indicated, Plaintiff could only perform jobs that did not require the use of two arms, and she limited Plaintiff to jobs where a "worker is not working with their hands or arms lifting things to perform the essential job tasks." Tr. 636. Even if the ALJ had included every specific limitation articulated in Plaintiff's argument, it would not have changed the VE's testimony regarding the jobs Plaintiff could perform. In sum, despite Plaintiff's unfortunate circumstances, he is not precluded from all work. The ALJ permissibly relied on the VE's testimony to conclude there are jobs that Plaintiff can perform without use of his non-dominant left arm.

Plaintiff also argues that the ALJ did not discuss Dr. Balderman's opinion. *See* ECF No. 9-1 at 18-20. However, the ALJ plainly discussed Dr. Balderman's opinion in the decision and afforded it significant, but not controlling, weight. Tr. 597. The ALJ cited the exhibit number of the opinion, so there is no question that it was considered. The ALJ was not required to recount in detail the specifics of Dr. Balderman's opinion. *See Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (an ALJ is not required to discuss every piece of evidence submitted); *Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012); ("ALJ need not marshal every piece of evidence that supports his RFC determination."); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (internal citations and quotations omitted) (holding that the ALJ is not required to have

mentioned every item of testimony or evidence presented to him). As discussed above, the detailed

manipulative limitations opined by Dr. Balderman reasonably fell within the broad functional

limitations posed to the VE in the hypothetical question and which the ALJ included in the RFC.

Plaintiff further argues that the RFC did not mirror the limitations described in Dr.

Balderman's opinion. *See* ECF No. 9-1 at 19-20. However, Dr. Balderman was not a treating

source whose opinion could be afforded controlling weight. *See* 20 C.F.R. § 416.927. Furthermore,

the ALJ never purported to afford the opinion controlling weight. Tr. 597. Rather, the ALJ gave

the opinion "significant weight" and included some, but not all, of the limitations described by Dr.

Balderman. An ALJ does not necessarily "reject" opinion evidence when the opinion is assessed

less than controlling weight and where it is evident that the ALJ's RFC determination incorporates

limitations contained in that opinion. *See, e.g., Cottrell v. Comm'r of Soc. Sec.*, No. 17-CV-6893-

FPG, 2019 WL 201508, at *3 (W.D.N.Y. Jan. 15, 2019) ("[c]ontrary to [claimant's] assertion, the

ALJ did not wholly reject [the doctors'] opinions; instead, she afforded them 'partial' and 'some'

weight and . . . relied on portions of them to determine [claimant's] RFC[;] . . . [j]ust because the

ALJ did not afford either [doctor's] opinion controlling weight does not mean that she substituted

her own view of the medical evidence for those opinions").

While the ALJ did not include some of the limitations Dr. Balderman described in sitting

and standing, the ALJ's decision is supported by substantial evidence. As noted above, the ALJ's

RFC finding need "not perfectly correspond with any of the opinions of medical sources cited in

his decision," and the ALJ is "entitled to weigh all of the evidence available to make an RFC

finding that [is] consistent with the record as a whole." *Ortiz*, 298 F. Supp. 3d at 587 (citing *Matta*

*v. Astrue*, 508 F. App'x. at 56). Dr. Balderman's examination findings were essentially normal as

it related to Plaintiff's spine and lower extremities, and those normal findings essentially mirrored

other normal findings and discussed above. This evidence was consistent with the ALJ's RFC

finding. Thus, the ALJ properly afforded significant, but not controlling weight to Dr. Balderman's opinion, and his determination was supported by substantial evidence.

Finally, Plaintiff argues that the ALJ erred by not including all of the functional limitations described by consultative examiners Dr. Luna and Dr. Santarpia. *See* ECF No. 9-1 at 20-22. For the same reasons discussed above, it was not error for the ALJ to afford significant weight to an opinion and not include that opinion verbatim in the RFC determination. Neither Dr. Luna nor Dr. Santarpia were treating sources whose opinions could be afforded controlling weight. *See* 20 C.F.R. § 416.927. Furthermore, the record shows that the ALJ's RFC determination was generally consistent with the opinions of the consultative examiners.

Dr. Luna indicated Plaintiff had no limitations in his ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and make appropriate decisions. Tr. 1172. She indicated that Plaintiff was only "mildly limited in his ability to perform complex tasks independently, relate adequately with others, and appropriately deal with stress" and that those difficulties were caused by distractibility. *Id*. She did not opine, as Plaintiff suggests, that Plaintiff was precluded from all such activity, only that he had mild limitations. *Id*.

Similarly, Dr. Santarpia indicated Plaintiff had only "mild" impairment of his ability to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress due to fatigue. Tr. 379. As was his duty, the ALJ reasonably synthesized those opinions down to an RFC that accounted for Plaintiff's mild interpersonal difficulties by limiting him to have frequent, rather than constant, interaction with others. Tr. 591. *See Matta v. Astrue*, 508 F. App'x at 56 (citing *Richardson v. Perales*, 402 U.S. at 399. Here, the ALJ accounted for the mild limitation to perform complex and stressful tasks by limiting Plaintiff to at most semi-skilled work. Tr. 591. Furthermore, the jobs cited by the VE were SVP level three

24

jobs, which represent the least mentally demanding of semi-skilled jobs. Tr. 634. *See* SSR 00-4p. In sum, both Drs. Luna and Santarpia indicated that Plaintiff's limitations were only "mild" (Tr. 379, 1172), and contrary to Plaintiff's argument, the record reflects that the ALJ considered the limitations discussed in these opinions.

While Plaintiff may disagree with the ALJ's conclusion, the Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at \*3 (2d Cir. Jan. 18, 2018) (internal citations and quotations omitted). Plaintiff here failed to meet his burden of proving that no reasonable factfinder could have reached the ALJ's findings on this record. *See Brault v. Soc. Sec. Admin.*, *Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

For all these reasons, the Court finds that the ALJ appropriately considered the evidence of record, including Plaintiff's testimony, the medical findings in the record, and the medical opinion evidence, and the ALJ's determination was supported by substantial evidence. Accordingly, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 13) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE